Hlinak v. CTA Hlinak v. CTA So I am wondering where you address that basis for dismissal in your brief. I don't believe I specifically addressed that particular issue in the equal protection part of the brief, but I also don't agree that we waived. I'm of the opinion that equal protection does stand as briefed and as in the complaint. There's enough there, so to speak, that it does hold up and that the class can be developed. Under equal protection, as I understand it, you need not only to have the class being of four people in this example, but also you need the fundamental right. And I believe in this case we have both the fundamental right and the class-defined property. That's equal protection. Now, the reason I'm here, I have not been in this courtroom ever. I was licensed 30 years ago. I haven't done an oral argument in over 20 years. I do real estate. I do construction. That's what I do. But the reason I'm here is because of my father. He was the one who taught me. He was a lawyer, first-deaf lawyer in America. And he brought me here and he said, you've got to be licensed. And they say you have to uphold and defend the Constitution. So I used to be a bully, and I take that for what it means. In this case, I thought about it for months, even, I think, years. But there seems to be no question that under the Constitution, CTA has simply gone a bridge too far. They are absolutely, without question, beyond all known case law. They are simply out. You raised an equal protection claim alleging discrimination based on a class of poverty. Setting aside the lack of legal support for such a claim, was that claim raised in the district court? District court. You know, I don't recall. I believe it was, but I don't really remember for sure. But I point out that recent evidence shows that under poverty, black and Spanish people seem to be generally, summarily included. Just so you know. I bring you one more case. I have many cases quoted. This is a subsidiary case. It's the state of New York versus the United States, an old case, 342 U.S. 882. The only reason I bring it up, it's got a nice quote at the end. Maybe I get to it, maybe I don't. But that case basically says that the amount that the train charges for the interstate versus the interstate has to be balanced in the same. You have to figure it out. You have to pay their share. In this case, the facts and the law seem to keep changing. In a car accident case, you break the car, it's $10,000, it's a finite amount. But here in the case, all the numbers are changing. The law is changing, the facts are changing. For example, last Christmas, Uber got permission to go out to O'Hare and pick up people for $5. That's a new fact, and that affects the regulation of the airport. So it kind of plays into it. And then yesterday, in the paper, I read that Trump and Ricketts, the Cubs, are getting into it. That's a new fact. You might say, well, what's that got to do with the airport, the CTA and all that? But it does. If Donald Trump decides to be mayor of Chicago as a Constellation Prize, and him and Ricketts get into it, both billionaires, what's going to happen to the CTA? I'll stop at Addison Avenue. Will it be $10, ballgame days only? And what about Devon Avenue? He says he likes the Muslims, but maybe they're going to put a security guard on that bus, and now that bus is going to be $10 too. And maybe those people stay in the political solution. They'll come back, they'll vote for a new mayor. And maybe, like the 70s, there'll be the white flag and they'll all move up the road. Which will it be? I don't know. Does it have to be? I come back. Thank you, counsel. Ms. Kaplan. Thank you. May it please the Court, my name is Rachel Kaplan and I represent the CTA. I'd like to start off by answering Judge Rovner's question, which was asked earlier. And that is whether or not plaintiffs asserted a poverty class. They did not. It was not asserted in their amended complaint. And that fight was not addressed in the district court's decision. Plaintiff's complaint was properly dismissed here because they did not assert any claims under the rights of traffic travel, the Equal Protection Clause, or the Dormant Commerce Clause. The CTA will address each of those claims, beginning with the Dormant Commerce Clause. The Dormant Commerce Clause does not even apply here because the CTA was a market participant. The CTA provided a service, the use of the Blue Line from the O'Hare Station to the city for a fee. In that respect, it was just like the Ensley case, where this Court deemed that the city of Chicago was a market participant because it provided access to the Skyway for a fee. Therefore, the Dormant Commerce Clause – excuse me? Yes. What was the reasoning given by the CTA for exempting O'Hare employees from the surcharge? Your Honor, there is nothing in the record about that issue. However, presumably, those O'Hare employees were exempt because they were required to travel frequently to and from the airport for their jobs, and also because they were, in all likelihood, low-earning individuals. And just because the O'Hare employees were exempt does not mean that in-state individuals were in any way favored. O'Hare employees can be in-staters or out-of-staters. It's quite possible that an O'Hare employee lives, for example, in Wisconsin. So it doesn't necessarily result in any kind of interstate or out-of-state preference. Turning back to the Dormant Commerce Clause, in addition to the CTA being a market participant, which makes the Dormant Commerce Clause completely ineffective here, plaintiffs have not asserted any burden on interstate commerce. The plaintiffs were already in the state of Illinois when they took the O'Hare Blue Line, so their right to interstate travel was not at all impaired. Plus, both the plaintiffs here had other transit options for O'Hare. They elected to take the CTA. However, they could have taken a cab. They could have taken Pace. They could have taken Metro. They chose not to. And at the very most, the surcharge presented an incidental burden, especially when you compare it to the likely cost of Lenox's plane ride from Nevada into Illinois or John Pace's price of her car rental at O'Hare. Unless the Court would like, I will not go into depth on the equal protection or the right to travel claims because, as the District Court found, both of those claims were forfeited because they were so underdeveloped in both facts and law. If there are no further questions, the CTA asks this Court to affirm the District Court. Thank you. Thank you. Anything further, Mr. Myers? This case affects not only the right to travel. It's got other rights stuck in there. For example, it's got the right to associate. When the bum goes to O'Hare to use the bathroom, to go look at the museum out there, to visit with the Asian girls coming in from China, that's his right to associate. There have been all kinds of cases. One of them says you have the right to associate in a law school. The guy said he wanted to go to, I think it was Harvard, something like that, and they said, yeah, no difference. Well, he says, no, I want to go there so I can meet the other people. Right to associate. It kind of comes up in this. The guys can go to Midway, but they can't go here. It costs more to associate. And then you've got one more association, the freedom of religion. That Amish kid from the Witness movie, if he goes to visit his uncle, and then he goes to O'Hare, and then he has to go to Union Station, that's interstate traffic. He can't use no cars, no gas for him. It's a religious thing. But he's part of the group. He's part of everybody. So it's more of a burden on him than others. That Amish kid, he got to walk out maybe. My dad used to work at Sears Power. The Amish kids walked up to the top of Sears Power all damn day, day after day. So maybe that kid's got to walk that five miles, one-and-a-half-hour walk out of there if his dad gets upset about that 275. Those Amish are kind of funny that way. But they're part of this too. So there's ripples in this, I noticed. Now, let's talk about the case itself, the cases. Not all of them. I've got too many cases. Let's look at this case as being like a building, a bridge. You've got the ramp system, the ramp system, the pass system, the damages at that end. Those parts are easy to fix. The damages, the jury comes in, $300,000, should be $100,000. You can fix that. The pass over here, the guy said it was a left-turn right-turn. You can fix that. But the construction, the bridge in the middle, all that, that's what's important. That's what holds it all together. And you might notice that in this case, I got a case for pretty much every support team there is. Builders, you know. If you go through it real quick, if I remember correctly, it's not interstate traffic. Lots of cases it is. There's no federal right to the train, lots of cases. The Rosa Parks case, lots of cases. You charge for the service, lots of taxes. There's a tax for service, lots of cases to figure out which is which. Is the service cost reasonable? Lots of cases. I just quoted one. It's got to be reasonable. But the subsidiary has to be reasonable in light of the other charge. Three cases quoted on that. They quote the only case the CTA quotes in their favor is the Department of Kentucky case, which is an off-point case. It does not involve a fundamental right. It involves government fundamental rights. On a pendulum, citizens' rights are over here. The government rights are over here. Well, we're over here, and their case is over there. That's called off-point. I love you, too. So they have no case to support. I've got, I think, I lost count. I've got eight or ten cases to support that bridge, just so you know. And no misses. No misses. And then the exemption. This exemption is just terrible. Interstate problems, interstate problems, all kinds of problems. If it's the true exemption, if they're real CTA employees, the cost would be zero. That's what CTA employees pay when they go to work at DL. Zero. So this is not zero. This is 225. That's called a friend and family favor. But then it's something else. But it's not a clear, pure exemption. It's just not. And the judge very clearly asked why. Political favor. That's a good answer. The exemption creates terrible hostilities. It does all the things the Commerce Clause is tending for us to not have happen. Arguments counts, people. The case will be taken under advisement.